# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHERN DIVISION

| | |
|---|---|
| In the Matter of: } | |
| STEVEN J. WEST } | CASE NO. 19-81080-CRJ-7 |
| SSN: XXX-XX-3727 } | |
| KELLY O. WEST } | |
| SSN: XXX-XX-5274 } | |
| } | CHAPTER 7 |
| Debtor(s). } | |

## MEMORANDUM OPINION PARTIALLY AVOIDING
## REDSTONE FEDERAL CREDIT UNION'S JUDICIAL LIENS

This case is before the Court on Debtors' Motions to Avoid two judicial liens held by Redstone Federal Credit Union (hereinafter "Redstone"). The Debtors contend that their principal residence has a fair market value of $110,000 and argue that there is no non-exempt equity in the property to which Redstone's judicial liens may attach. Accordingly, the Debtors seek to totally avoid the judicial liens pursuant to 11 U.S.C. § 522(f) of the Bankruptcy Code. Redstone values the subject property at $152,000 and argues that there is sufficient equity in the property for both of its judicial liens to attach.

## PROCEDURAL HISTORY

On July 15, 2019, the Debtors filed a Section 522(f) Motion to Avoid Judicial Lien of Redstone (hereinafter "Motion" or "Motion to Avoid Judicial Lien"), ECF No. 27, seeking to avoid Redstone's judicial lien against the Debtors' real property. At the initial hearing held on the Motion, Redstone requested additional time to obtain an appraisal of the Debtors' real property and the parties requested that the Court schedule an evidentiary hearing on the issue of valuation. One day prior to the scheduled Evidentiary Hearing, the Debtors filed a second Motion to Avoid Judicial Lien of Redstone, ECF No. 53, seeking to avoid a separate judicial lien held by Redstone against the Debtors' real property.

During the Evidentiary Hearing held on December 19, 2019, the parties requested that the Court resolve the issue of lien avoidance as to both judicial liens without further hearing. The Court has now carefully considered the testimony and all of the evidence presented during the Evidentiary Hearing, the applicable law, and arguments of counsel, and for the reasons set forth below the Court determines that for purposes of § 522(f) the value of the Debtors' residence is $126,714.75. The Court will enter a separate Order in conformity with this Opinion, partially avoiding Redstone's lien pursuant to 11 U.S.C. § 522(f).

## JOINT STIPULATIONS AND FINDINGS OF FACTS[1]

1. On May 10, 2018, Redstone recovered a judgment against the Debtor, Steven West, in the District Court of Limestone County, Alabama in the sum of $6,230.45, plus $293.33 in court cost.[2] On May 31, 2018, Redstone recorded the judgment in the Probate Court of Limestone County, Alabama.[3]

2. On November 8, 2018, Redstone recovered a separate judgment against the Debtor, Kelly West, in the District Court of Limestone County, Alabama in the sum of $5,595.36, plus $312.10 in court costs.[4] On December 4, 2018, Redstone recorded the judgment in the Probate Court of Limestone County, Alabama.[5]

---

[1] The facts and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052. To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such. Further, to the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.
[2] Joint Stipulation of Undisputed Facts and Disputed Issues, ECF No. 52.
[3] *Id.*
[4] Section 522(f) Motion to Avoid Judicial Lien of Redstone, ECF No. 53.
[5] *Id.*

2

3. On April 9, 2019, the Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code in the Northern District of Alabama, Northern Division. On the petition date, the Debtors resided at 26865 Capshaw Road, Athens, Alabama, 35613.[6] Pursuant to ALA. CODE § 6-10-2, the Debtors are entitled to claim a homestead exemption in the jointly owned property in the amount of $31,000. Redstone holds two liens against the real property totaling $12,431.24 pursuant to the recorded judgments.

4. The property is encumbered by a first mortgage in favor of Wells Fargo Bank, N.A. (hereinafter "Wells Fargo") which has priority over Redstone's judicial liens. The amount owed to Wells Fargo on the petition date was $86,924.05.[7]

5. The Debtors' residence is a one-story, ranch-style, brick house which contains 1,579 square feet of gross living area, three bedrooms, two bathrooms, a two-car attached garage, a covered front porch, and an uncovered back deck. The house was built in 1999 on a lot containing 35,190 square feet or approximately .8 acres.

6. The Court heard testimony regarding the value of the subject property from Julie Glenn Davis (hereinafter "Davis"), a Certified Real Estate Appraiser with Griffin Appraisals on behalf of Redstone, and from Bill L. Nettles (hereinafter "Nettles"), a Certified General Real Property Appraiser with Nettles Real Estate Services, on behalf of the Debtors. At the beginning of the Evidentiary Hearing, both parties offered into evidence the written appraisal reports prepared by Davis and Nettles. The Court admitted both appraisals into evidence and allowed Davis and Nettles to state their expert opinions as to the fair market value of the subject property, thereby

---

6      Joint Stipulation of Undisputed Facts and Disputed Issues, ECF No. 52.
7      *Id.*

3

permitting the testimony of each witness to begin with cross-examination of the respective experts.

7. While both appraisers utilized the sales comparison method to determine the fair market value of the subject property in its current condition, they arrived at widely different values. Davis valued the property at $152,000 as of November 1, 2019 on behalf of Redstone while Nettles valued the property at $110,000 as of July 3, 2019 on behalf of the Debtors.

8. Although the petition date is the operative date for determining value for purposes of § 522(f), neither party argued nor suggested that the values contained in either appraisal should be adjusted based on the later appraisal dates. Instead, the primary dispute between the parties is the fair market value as evidenced by the different opinions of the appraisers regarding the condition of the subject property, the marketability of same in its current condition, and the corresponding condition of the different groups of comparable sales chosen. Out of the total of six comparable sales selected by the two appraisers, the appraisers did not designate a single comparable sale in common.

9. To rate the condition of the subject property, Davis utilized the parameters contained in Fannie Mae's Uniform Residential Appraisal Report pursuant to which property is rated as a C1 through C6, with C1 being the highest rating given to newly constructed properties which have never been occupied and C6 being the lowest rating given to properties with substantial damage or deferred maintenance. Davis testified that she considered the subject property to be in "average" condition and rated its condition as C3, defined by Fannie Mae as follows:

> C3
> The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building

component may be updated or recently completely rehabilitated. The structure has been well maintained.

Note: **The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.)** and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the **majority of short-lived building components have been replaced** but not to the level of a complete renovation.[8]

10. Davis testified that she inspected the subject property by examining both the interior and exterior of the home for approximately thirty minutes during which time she also spoke with the Debtor, Steven West, regarding the condition of the home.[9] Davis testified that she found no significant maintenance issues despite the property having a missing shutter, missing gutters, rotten and unfinished wood on the front porch, and the unsealed back deck. Davis explained that she rated the subject property a C3, in part, because the Debtors updated the kitchen countertops approximately ten years ago and replaced the roof eleven years ago.

11. Based on the C3 rating, Davis selected comparable sales rated as C3 properties which sold for $93.22 per square foot to $101.63 per square foot. Davis states in the Supplemental Addendum which is attached to her appraisal that she made adjustments to the comparable sales for "the difference in gross living area, condition (NALMLS information reflects that #2 has been updated in a superior manner to the subject to include new appliances, etc.) baths, car storage, fireplaces and amenities. All three comparable sales were considered when establishing the market value . . . with the most weight being given to comparable sales #1 and #3, based on their being the most similar in size and condition to the subject, their more recent dates of sales,

---

8    Davis Appraisal, Uniform Appraisal Dataset (UAD) Definitions Addendum, p. 8, Defendant's Ex. 1. [emphasis added]
9    Davis Appraisal, Uniform Appraisal Dataset (UAD) Definitions Addendum, p. 8.

and their proximity to the subject property. . . ."[10]  While Davis states in the Supplemental Addendum that she made adjustments for the difference in condition of the comparable sales, the condition of each comparable sale was rated as a C3 and she only made an adjustment to comparable #2 in the amount of $10,000 for its superior condition.

12. According to the testimony of the Debtor, Kelly West, the appliances, flooring, and kitchen cabinets are all original to the home which was built twenty years ago.   There are cuts or tears in the kitchen floor caused by broken glass when the home was burglarized. West further explained that there is moisture damage to the plaster above the shower walls in the master bathroom which the Debtors have covered with plastic to prevent further damage and there is ceiling damage in both bathrooms caused by leaks around the ceiling ventilation fans.   The Debtor further testified that she and her husband have not been able to afford certain necessary repairs to the exterior of the home, including repairs to the front porch and back deck. Davis admitted that she did not notice the damages to the plaster or ceilings in the bathrooms, nor the damage to the kitchen floor.

13. Nettles, who testified on behalf of the Debtors, considers the subject property to be in "fair" to "average" condition and stated that although he did not use the same Fannie Mae form used by Davis, he would rate the subject property as either C4 or C5, which are defined by Fannie Mae as follows:

> C4
> The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only **minimal repairs** to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

---

10      Davis Appraisal, Supplemental Addendum, Defendant's Ex. 1.

Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

C5
The improvements feature obvious deferred maintenance and are in need of some **significant repairs**. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end or have exceeded their physical life expectance but may remain functional.[11]

14. According to Nettles, a C3 rating represents property that is in "above average" condition, a C4 rating represents property that is in "average" condition, and a C5 rating is for property that is "below average." Nettles testified that the subject property is not in average condition and is currently not marketable because the back deck needs to be replaced, the front porch needs to be painted and repaired, a shutter needs to be reinstalled, portions of the gutters are missing, there is water damage to the bathroom ceilings, and all appliances are twenty years old.

15. Nettles testified that it could cost up to $20,000 to bring the property up to a C4 rating and $25,000 to bring the property up to a C3 rating or condition. While Nettles orally testified that he considers the home to be unmarketable in its current condition, in his appraisal report admitted into evidence he stated in contrast that "[t]he subject needs minor repairs and cosmetics."[12]

---

11  Davis Appraisal, Uniform Appraisal Dataset (UAD) Definitions Addendum, p. 8 [emphasis added].
12  Nettles Appraisal, p. 2, Plaintiff's Ex. 4.

7

16. Finally, the Court notes that the Limestone County Tax Assessor appraised the home at $128,500 for the 2018 tax year.[13]

## CONCLUSIONS OF LAW

A debtor may avoid a judicial lien pursuant to 11 U.S.C. § 522(f)(1) "to the extent that such lien impairs an exemption to which the debtor would have been entitled under" applicable state or federal law.[14] To avoid Redstone's lien, the Debtors must establish that (1) the lien sought to be avoided is a judicial lien; (2) the lien impairs a claimed exemption to which the Debtors would have otherwise been entitled; and (3) the Debtors have an interest in the property.[15] To determine whether a lien impairs a claimed exemption to which a debtor would have otherwise been entitled, the fair market value of the property at issue must established.[16]

In the case before the Court, the only issue in dispute is whether Redstone's judicial liens impair the Debtors' homestead exemption, based upon the fair market value of their residence. The appraisals offered by the parties in support of their respective positions reveal that the "[v]aluation of assets 'is not an exact science and has inherent vagaries.'"[17] Given such inherent vagaries, the bankruptcy court is "not bound to accept the values contained in the parties' appraisals; rather it may form its own opinion of the value of the subject property . . . and may arrive at a different value than any of the valuations presented.[18] Indeed, "[h]eightened scrutiny

---

13   Nettles Appraisal, Plaintiff's Ex. 4.
14   11 U.S.C. § 522(f)(1).
15   *Pittman v. Lawrence (In re Pittman)*, 2017 WL 3973902 *3 (Bankr. S.D. Ga. 2017).
16   *Id. *4.*
17   *Alexander v. JP Morgan Chase Bank, N.A. (In re Alexander)*, 2014 WL 3672135 *5 (Bankr. M.D. Fla. 2014)(Funk, J.).
18   *In re Big Dog II, LLC*, 602 B.R. 64, 70 (Bankr. N.D. Fla. 2019)(Oldshue, J.).

8

is appropriate when two competent appraisals are presented by qualified appraisers, stating widely divergent values."[19]

The primary difference in the valuations opined by the two appraisers in this case is their disagreement about how to consider and to weigh the impact of the condition of the subject property on the value of the property. None of the comparable sales used by the two appraisers overlap due to their divergent conclusions regarding the condition of the subject property.

The Court has carefully reviewed the written appraisals and considered all of the testimony regarding the condition of the property and finds that the condition of the subject property should be rated a C4 because the Debtors' residence does not require major, structural repairs but mainly minimal or cosmetic repairs. While the original appliances in the home are most likely at or near the end of their physical life expectancy, no evidence was presented that they do not still function adequately. Further, the pictures contained in both appraisals of the subject property reveal that while minor repairs to the home are indeed needed, the house has generally been adequately maintained for a residence of its age.

Accordingly, the Court finds that the comparable sales used by Redstone's appraiser are not comparable enough to the subject property sufficient to provide a basis to establish the fair market value of the subject property given that each of the comparable sales was rated C3. While the exterior appearance of the comparable sales used by Davis are similar to the subject property, the Court finds that the condition of the subject property falls below a C3, which would have required improvements to be well maintained and have limited physical depreciation due to normal

---

19  *In re Alexander*, 2014 WL 3672135 at *5.

wear and tear. As the Debtor Kelly West testified, essentially all of the short-lived building components in the subject property are original to the home.

Although Nettles testified that it could cost up to $20,000 to bring the condition of the subject property up to a C4 condition, he did not provide sufficient detail upon which he based his opinion and the Debtors did not provide any further evidence to support the estimated cost of repairs. Rather, Nettles' statement in his appraisal that the subject property only needs minor repairs and cosmetics is supported by the pictures of the subject property contained in both of the appraisals.

After reviewing each of the comparable sales used by both appraisers and having rejected the comparable sales used by Redstone's appraiser because the condition of each property was rated C3, it appears that Nettles' comparable sale #1 is the most comparable property to the subject property. Nettles' comparable #2 and comparable #3 are both inferior properties because the houses are situated on much smaller lots than the subject property, with each lot consisting of only 8,500 square feet in comparison to the subject property which consists of 35,241 square feet. Further, both properties appear to be situated much closer to neighboring homes due to the smaller lot sizes. Finally, the pictures attached to Nettles' appraisal reveal that the vinyl exteriors of both comparables #2 and #3 appear inferior to the brick exterior of the subject property.

It is the Court's finding that Nettles' comparable #1 is the most comparable to the subject property of the six sales selected by both appraisers in condition, lot size, and overall exterior appearance. Comparable #1 is located .4 miles from the subject property, the home is a brick, ranch-style home similar in appearance and size to the subject property, and the house is located

10

on a lot containing 43,500 square feet. Comparable #1 sold in June of 2019 for $80.25 per square foot.

The Court further finds that the increased age of the home is offset by its slightly larger size and the addition of a fireplace. Although Nettles adjusted comparable #1's value down by $8,000 because he considered its condition to be "average" or superior to the subject property which he rated "fair to average," the Court finds that the subject property should instead be rated a C4 or in "average" condition. Accordingly, the Court finds that the $8,000 downward adjustment was not necessary and values the subject property as of the petition date at $126,714.75, calculated at $80.25 per square foot, the price per square foot for which Nettles' comparable # 1 sold.

## CONCLUSION

Having determined the fair market value of the subject property to be $126,714.75 as of the petition date, the Court turns to the statutory formula for calculating the extent to which a lien impairs an exemption as set forth in 11 U.S.C. § 522(f)(2)(A), which states as follows:

> (2)(A) for the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of –
>
> (i) the lien;
>
> (ii) all other liens on the property; and
>
> (iii) the amount of the exemption that the debtor could claim if there were no liens on the property; exceeds the value that the debtor's interest in the property would have in the absence of any liens.[20]

---

20     11 U.S.C. § 522(f)(2)(A).

Case 19-81080-CRJ7    Doc 55    Filed 01/15/20    Entered 01/15/20 13:29:34    Desc Main
Document    Page 11 of 12

The parties stipulated that Redstone's combined judicial liens total $12,431.24; all other superseding liens totaled $86,924.05 on the petition date; and that the Debtors are entitled to claim a homestead exemption in the amount of $31,000. Accordingly, the Court will enter a separate Order in conformity with this Opinion avoiding Redstone's judicial lien by the extent to which it impairs the Debtors' exemptions in the amount of $3,640.54 as calculated pursuant to § 522(f)(2)(A). Redstone retains judicial liens in the total amount of $8,790.70.

**IT IS SO ORDERED** this the 15th day of January 2020.

/s/ Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge